UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE
--------------------------------------------------------------x
UNITED STATES OF AMERICA                  :
                                          :
                                          :
        -against-                         :        Criminal Action No. 06-27    *CMS*
                                          :
ANDREW N. YAO                             :
                                          :
                    Defendant.            :
--------------------------------------------------------------x


# DEFENDANT ANDREW N. YAO'S MEMORANDUM OF LAW
# SUBMITTED IN SUPPORT OF HIS PRETRIAL MOTIONS


**BRAFMAN & ASSOCIATES, P.C.**
*Attorneys for Andrew N. Yao*
**767 THIRD AVENUE, 26TH FLOOR**
**NEW YORK, NEW YORK 10017**
**(212) 750-7800**


**MARC AGNIFILO, ESQ.**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**
---------------------------------------------------------x
**UNITED STATES OF AMERICA**                   :
                                               :
                                               :
  **-against-**                                :   **Criminal Action No. 06-27**
                                               :
**ANDREW N. YAO,**                             :
                                               :
              **Defendant.**                   :
---------------------------------------------------------x

## DEFENDANT ANDREW N. YAO'S MEMORANDUM
## OF LAW IN SUPPORT OF HIS PRETRIAL MOTIONS

## I.    THE INDICTMENT

### A.    Summary of Issues Relating to Venue

Andrew N. Yao is charged in an Indictment containing fourteen counts.   Of the

fourteen counts, the Indictment itself alleges that the criminal conduct underlying nine of

those counts – specifically counts 2, 4, 5, 6, 7, 8, 9, 10 and 11 – occurred in the Eastern

District of Pennsylvania, and not within the District of Delaware.  Of the remaining five

counts, as will be set forth below, defendant asserts that two – specifically, counts 1 and

3, are not properly venued in the District of Delaware.  Indeed, only one of the so-called

"money laundering" counts – count 12 – and the two counts relating to the Delaware

bankruptcy proceeding – specifically counts 13 and 14 -- are properly venued in the

District of Delaware.

### B.    Summary of the Fourteen Count Indictment

Count One charges that in August 1998, Mr. Yao made a false statement to

Wilmington Trust of Pennsylvania, a financial institution, in connection with an

application for a $25,000,000 line of credit, in violation of Title 18, United States Code,

Section 1014 (hereinafter "Section 1014"). Count Two charges that in August 1998, Mr. Yao made a false statement to First Union of Georgia in connection with an application for a $920,000 credit line, in violation of Section 1014. Count Three charges that in September 1998, Mr. Yao made a false statement to a representative of Wilmington Trust of Pennsylvania in connection with the $25,000,000 line of credit referred to in Count One, in violation of Section 1014.

Count Four charges that in October 1998, Mr. Yao made a false statement to First Union Bank of Georgia in connection with an application for a $1,850,000 credit line, in violation of Section 1014. Count Five charges that in December 1999, Mr. Yao made a false statement to First Union National Bank (hereinafter "First Union") in connection with an application for a $3,000,000 credit line, in violation of Section 1014. Count Six charges that in November 2000, Mr. Yao made a false statement to First Union National Bank in connection with an application for a $1,000,000 credit line. Count Seven charges that on May 17, 2001 Mr. Yao used a private commercial carrier for the purpose of executing a scheme to defraud U.S. Bancorp Leasing and Financial, Inc., in violation of Title 18, United States Code, Section 1341. Count Eight charges that in March 2002, Mr. Yao made a false statement to First Union in connection with an application for a $5,853,000 loan, in violation of Section 1014. Count Nine charges that in March 2002, Mr. Yao made a false statement to First Union in connection with an application for a $6,288,000 loan, in violation of Section 1014.

Count Ten charges that on June 24, 2002, Mr. Yao caused a wire transmission for the purpose of executing a scheme to defraud Wachovia Mortgage Company, in violation of Title 18, United States Code, Section 1343. Count Eleven charges that on

June 26, 2002, Mr. Yao engaged in a monetary transaction involving criminally-derived proceeds related to the wire fraud of count ten, in violation of Title 18, United States Code, Section 1957. Count Twelve charges that on July 12, 2002, Mr. Yao engaged in a monetary transaction involving criminally-derived proceeds related to the wire fraud of count ten, in violation of Section 1957. Counts Thirteen and Fourteen each allege that on August 28, 2003, Mr. Yao made false statements during a sworn deposition in connection with a bankruptcy proceeding involving his former company, Student Loan Finance Corp

## II.    STATEMENT OF FACTS

The facts relevant to the issues raised in this motion are set forth in the accompanying affidavit of Marc Agnifilo, Esq., duly notarized on October 12, 2006, and the exhibits appended thereto, which are incorporated herein by reference and made part thereof.

## III.  ARGUMENT

### POINT 1

### COUNTS ONE THROUGH ELEVEN SHOULD BE DISMISSED FOR IMPROPER VENUE

Based on the allegations of the Indictment as well as materials provided in discovery, including Grand Jury minutes and testimony, it appears that any criminal conduct underlying counts one through eleven of the Indictment took place, if at all, within the Eastern District of Pennsylvania.[1]  In regard to nine of these counts – specifically counts 2, 4, 5, 6, 7, 8, 9, 10 and 11 – as will be shown below, the Government specifically alleges that the criminal conduct underlying the count took place in the Eastern District of Pennsylvania.  In regard to two of the other counts – specifically counts 1 and 3 – while the Government alleges in the Indictment that the criminal activity underlying those counts took place, at least in part, within the District of Delaware, the facts surrounding the offenses and the relevant decisions of the Supreme Court and U.S. Courts of Appeals indicate that venue in the District of Delaware is inappropriate.

Point 1 will be divided into two parts.  In the first part – Part A – the Court will be asked to dismiss those nine counts which specifically allege criminal conduct taking place outside the District of Delaware.  In Part B, it will be shown that all conduct related to Counts 1 and 3, each of which are related to an application for a credit line from a bank called Wilmington Trust of Pennsylvania, took place in the Eastern District of Pennsylvania and that that venue for those counts cannot lie in the District of Delaware.

---

[1] If defendant's motion to dismiss counts one through eleven is granted, only three counts  - two relating to the alleged bankruptcy fraud, and one relating to an unlawful monetary transaction – would remain in the District of Delaware.

5

**A. Counts 2, 4, 5, 6, 7, 8, 9, 10 and 11 Should Be Dismissed Because The Government Alleges That The Criminal Conduct Underlying Those Counts Took Place In The Eastern District of Pennsylvania, And Not In The District Of Delaware**

"The Constitution twice safeguards the defendant's venue right: Article III, Section Two, Clause 3 instructs that '(t)rial of all Crimes...shall be held in the State where the said Crimes shall have been committed'; the Sixth Amendment calls for trial 'by an impartial jury of the State and district wherein the crime shall have been committed.'" United States v. Cabrales, 524 U.S. 1, 6 (1998). Rule 18 of the Federal Rules of Criminal Procedure "echoes the constitutional commands," Id. by providing that a "prosecution shall be had in a district in which the offense was committed." Fed. R. Crim. P. 18.

Insofar as the Indictment alleges that the criminal activity related to Counts 2, 4, 5, 6, 7, 8, 9, 10 and 11 took place in the Eastern District of Pennsylvania, and not within the District of Delaware, the Court should dismiss those counts at this time. See generally Fed. R. Crim. P. 18; Cabrales, 524 U.S. at 1; United States v. Perez, 280 F.3d 318 (3d Cir. 2002).[2]  See United States v. Wood, 364 F.3d 704, 710 (6th Cir. 2004)("Venue is therefore appropriate only in the district where the conduct comprising the essential elements of the offense occurred.").

---

[2]Defendant anticipates the Government will concur with dismissal of these counts on the grounds of improper venue. Should the Government take a different position, the defendant reserves the right, if agreeable to the Court, to advance additional arguments to support the position that the Eastern District of Pennsylvania counts should not be venued in this District.

**B. Count 1 and 3 Should Be Dismissed Because The Alleged Criminal Activity Underlying Those Counts Took Place In The Eastern District Of Pennsylvania.**

Counts 1 and 3 relate to allegedly false statements made by Mr. Yao to representatives of a financial institution called Wilmington Trust of Pennsylvania (hereinafter "WTPA") for the purpose of influencing the bank to extend a $25,000,000 line of credit. Based on a review of materials provided in discovery, including the Grand Jury testimony of Kevin Boyer, the WTPA representative to whom Mr. Yao allegedly made the false statements, the false statements underlying Counts 1 and 3 were made exclusively within the Eastern District of Pennsylvania. The basis for the Government's claim that venue properly lies within the District of Delaware is the fact that Boyer incorporated the information received from Mr. Yao into a presentation Boyer made to the bank's loan committee, which is located in Delaware. The Government will argue that since the loan committee, which is the body that eventually approved the loan, was located in Delaware, that the offense committed by Yao occurred, in part, in Delaware. As will be shown below, however, the alleged false statement offense was not a continuing offense, and such offense began and ended exclusively within the Eastern District of Pennsylvania, regardless of where the loan was approved.

In determining the appropriate venue for an offense, the Supreme Court has reaffirmed the general rule that "the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." Cabrales, 524 U.S. at 6-7 *quoting* United States v. Anderson, 328 U.S. 699, 703 (1946). Therefore, in order to conduct the appropriate analysis, the charged offenses and the underlying acts must be further examined.

7

1.    Underlying Acts of Count 1

Count 1 alleges that the false statement related to three fictitious entries in a Personal Financial Statement of Andrew N. Yao that was given to a WTPA representative. These entries were (1) that the defendant's assets included restricted securities in Century Financial Services, Inc., with a book value of $2,216,588, (2) that the value of defendant's ownership interest in real estate in Bryn Mawr, Pennsylvania was $1,700,000 with a mortgage of $743,986, and (3) that the defendant's liabilities were $3,842,239. The Government alleges these three entries were false because (1) the defendant had no stock ownership in Century Financial Services as of December 1997, (2) the defendant had no personal ownership interest in the real estate in Bryn Mawr, Pennsylvania[3], and (3) the defendant had a $600,000 line of credit with First Union National Bank of Georgia (hereinafter "First Union of Georgia), which was omitted from the schedule of liabilities.

The acts underlying Count 1 were testified to by Kevin Boyer. See Affidavit of Marc Agnifilo, Esq., p's 6-8. Boyer testified that he worked for WTPA from May 1998 until April 2001. He stated that WTPA had "pretty much one branch" office. Originally, the office was in West Chester, Pennsylvania, and in about the Summer of 1999, the office moved to Villanova, Pennsylvania. (Boyer – p's 4,5). In 1998, Mr. Yao came to WTPA and sought a warehouse line of credit. He spoke to Boyer, who was the commercial lender. At one point, Yao, Boyer and a second WTPA representative named Joe Finley had a lunch meeting. (Boyer – p.11) It is not clear precisely where this meeting took place. However since Yao lived in Bryn Mawr, Pennsylvania and WTPA's office was in Pennsylvania, it appears this lunch meeting was within the

---

[3] Indeed, the property was jointly owned by Mr. Yao and his wife.

8

Eastern District of Pennsylvania. There is certainly no indication in the Grand Jury testimony, or from any other source, that his lunch meeting took place in Delaware. At this lunch meeting, Yao handed to Boyer a personal financial statement pertaining to Mr. Yao. (Boyer – p. 11).[4]

After receiving Yao's financial statement and gathering other relevant information, Boyer, as the commercial lender on the proposed SFC loan, made a presentation to the Wilmington Trust Loan Committee on September 30, 1998. (Boyer – p. 7). Boyer explained that the loan committee typically consisted of about 25 people, that there were several key senior members of the committee who always attended the meetings, and a number of others who sometimes attended these meetings. (Boyer – p. 7). As part of Boyer's presentation, he prepared an "Intra-Company Memorandum," which set forth certain information he received from Mr. Yao. Boyer also provided to "key members" of the committee Yao's personal financial statement. After considering the information, the loan committee approved the loan.

## 2.  Acts Underlying Count 3

Count 3 alleges that Mr. Yao "told K.B., a representative of Wilmington Trust of PA, that SFC's and Yao's relationship with BestBank and its principal was limited to BestBank's purchase of certain SFC student loans when ... in fact...(a) defendant signed Subscription and Preferred Stock Sale Agreements on or about September 25, 1997 wherein SFC purchased 20,000 shares of BestBank stock for $500,000; and (b) the defendant previously had, and continued in September 1998 to have, a business

---

[4] Boyer testified that there were three "key pieces" of collateral for the $25,000,000 credit line. First, the loan was backed by the income stream from the student loans that were being funded with it. Second, SFC had secured an insurance policy through Royal Indemnity, virtually guaranteeing the loan. Third, Mr. Yao gave a personal guarantee to pay back the loan. As part of the personal guarantee, Boyer asked Yao to provide a personal financial statement. (Boyer – p's 12, 13)

9

relationship with principals of BestBank and its affiliated companies, including the defendant's relationship with Jack Grace, a former BestBank CFO, whereby SFC issued at least $27,500 in consulting payments to Grace during the period August 6, 1998 through October 16, 1998."

The facts underlying this count were provided by Boyer, who testified as follows:

Q.    So it is your testimony that, after reading the Wall Street Journal article, you called up Andrew Yao?

A.    Yes.

Q.    And you asked him what SFC's affiliation was with BestBank if any?

A.    Yes.

Q.    And what did he tell you?

A.    He told us that he had just sold some loans in the past to them.

Q.    Did he further tell you that neither he nor SFC had any connection to BestBank

A.    Pretty much, yes, other than the loan sale.

Q.    Right.  Other than the loan sale.

A.    Right.

Q.    Did he further tell you that neither he nor SFC had any connection, again, other than the loan sale - -

A.    No

Q.    - - to the principals of BestBank

A.    No

Q.    No, he didn't tell you that?

10

A.      No. He did not tell us that - -he did not - - he told us that his affiliation

        with BestBank was just the loan sale. He did not say, I have a

        relationship with the principals of BestBank. He did not say, I have an

        interest in BestBank, other than they were just simply, you know, a

        purchaser.

Q.      Just so the record is clear, did he deny any other connection with Best-

        Bank or its principals?

A.      No. He did not deny. We did not ask. It was, you know, question that

        wasn't asked and he didn't answer. He did not volunteer any

        information.

Based on this telephone conversation,[5] Boyer concluded that Yao had no other

connection to the principals of BestBank, despite the fact that Boyer never actually

asked Yao that question. Boyer then included an entry into his September 30, 1998

Intra-Company Memorandum that "SFC and its principal have no connection to

BestBank or its principals, other than the aforementioned loan sale." There is no

indication that Yao even knew of, much less endorsed, Boyer's statements in this

regard to the loan committee. Nonetheless, Yao is charged with violating Section 1014

based on this telephone conversation, and he is so charged in the District of Delaware.

        3.      The Court Should Decide the Venue Issue Pre-Trial

"A defendant in a criminal trial has a constitutional right to be tried in the district in

which the crime was committed." United States v. Perez, 280 F.3d 318, 327 (3d Cir.

2002). Undoubtedly, "the government initiates criminal prosecutions and, thus, has first

_____

5. The Grand Jury testimony is silent as to where the parties were during this telephone conversation.
However, since WTPA was located in Pennsylvania, and Yao lived in Pennsylvania, it appears both
parties were in Pennsylvania.

11

crack at selecting venue." United States v. Salinas, 373 F.3d 161, 163 (1st Cir. 2004). Very often, the government's decisions on the subject of venue are clearly appropriate and never become the subject of a legal challenge. However, when the government's venue choice is challenged, "the government bears the burden of establishing venue by a preponderance of the evidence." United States v. Pace, 314 F.3d 344 (9th Cir. 2002); United States v. Angotti, 105 F.3d 539 (9th Cir. 1997). The Third Circuit has explicitly stated, "our Court now joins those courts in adopting the preponderance standard for venue, a question which we reserved in United States v. Passodelis, 615 F.2d 975, 977 n.4 (3d Cir. 1980)." Perez, 280 F.3d at 330. Therefore, there is little doubt that "the government has the burden to establish proper venue by a preponderance of the evidence." United States v. Katzoff, 268 F.Supp.2d 493 (E.D.P.A. 2003).

Additionally, the Third Circuit has repeatedly held that a venue determination is a "matter of law." United States v. Palma-Ruedas, 121 F.3d 841 (3d Cir. 1997) reversed on other grounds sub nom. United States v. Rodriguez-Moreno, 526 U.S. 275 (1999); United States v. Baxter, 884 F.2d 734, 736 (3d Cir. 1989); Passodelis, 615 U.S. at 978. The fact that venue can be decided by the Court as a matter of law necessarily means that the Court may resolve venue determinations based on pre-trial motions if the Court is made aware of the necessary facts. See United States v. Katzoff, 268 F. Supp.2d 493 (E.D.P.A. 2003). Indeed, the District Court's decision in Katzoff was based on defendant's pre-trial motion that venue was inappropriate. The Katzoff decision stated that "the court (in Perez, 280 F.3d at 318) noted that a defendant may raise a venue objection in a pretrial motion…" 268 F. Supp.2d at 496. As set forth in the attached

affidavit of Marc Agnifilo, Esq., it is respectfully submitted that this case presents sufficient facts to allow the Court to make a pre-trial venue determination.

Finally, where, as here, "a defendant has been indicted on multiple counts, venue must be proper for each count." United States v. Pace, 314 F.3d 344 (9th Cir. 2002).

> 4.    Because The Alleged False Statement Offenses Underlying
>       Counts 1 and 3 Began, Continued and Ended Within the Eastern
>       District of Pennsylvania, Venue in the District of Delaware Is
>       Inappropriate

The Supreme Court has provided guidance to courts undertaking venue analyses. As a first principle, "(i)f the statute under which the defendant is charged contains a specific venue provision, that provision must be honored (assuming, of course, that it satisfied the constitutional minima)." Salinas, 373 F.3d at 164. See Travis v. United States, 364 U.S. 631, 635 (1961). On this point, the Second Circuit has observed, "(b)ecause establishing the locus for the trial of a crime under the constitution is often quite complex, Congress usually inserts a venue provision in a criminal statute to provide a method for determining venue." United States v. Saavedra, 223 F.3d 85, 89 (2d Cir. 2000).

However, Section 1014 is not one of the crimes where Congress has inserted a venue provision. See United States v. Angotti, 105 F.3d 539 (9th Cir. 1997)("this statute (Section 1014) does not indicate a method for determining the location of the crime for the purpose of establishing venue.") . In the absence of a venue provision, the "locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." Anderson, 328 U.S. at 703. "In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." United States v.

Rodriguez-Moreno, 526 U.S. 275, 279 (1999); see also Travis v. United States, 364

U.S. 631 (1961); United States v. Cores, 356 U.S. 405 (1958).

The nature of the crime proscribed by Section 1014 is determined by its essential

elements. Section 1014 has four such elements. First, the defendant must make or

cause to be made a false statement relating to an application to a bank. Second, the

defendant must have acted knowingly. Third, the false statement must have been

made for the purpose of influencing in any way the bank's actions. Fourth, the bank

must have been insured by the FDIC. See Pattern Crim. Jury. Instr. 5th Cir., Section

2.51 (False Statement To A Bank).

In determining the nature of the offense for purposes of venue, the most

important element is the third one, specifically that the statement be made for the

purpose of influencing the bank's actions. Significantly, the statute does not require

actual reliance on the part of the bank personnel. See United States v. Goberman, 458

F.2d 226 (3d Cir. 1972); United States v. Shaid, 730 F.2d 225, 232 (5th Cir. 1984) .

"Requiring proof of reliance on the statement by the lending institution would wreak

havoc with enforcement of the provision. A successful prosecution for the violation

would depend on the wholly fortuitous factor of actual reliance and not at all upon the

intent of the guilty party." Goberman, 458 F.2d at 229; see United States v. Braverman,

522 F.2d 218, 223 (7th Cir. 1975)("materiality does not depend on actual reliance.")[6].

---

[6] Prior to the Supreme Court's decision in United States v. Wells, 519 U.S. 482, 486 (1997), "most, but not all,of the Federal Courts of Appeals (had) held that materiality is an element" under Section 1014. The Wells decision clearly held that materiality is not an element of a Section 1014 violation. In making this correction in the state of the law, the Court reviewed pre-existing Circuit caselaw on the subject as follows: "Compare *United States v. Lopez*, 71 F.3d 954, 960 (C.A.1 1995), cert. denied, 518 U.S. 1008, 116 S.Ct. 2529, 135 L.Ed.2d 1053 (1996); *United States v. Ryan*, 828 F.2d 1010, 1013, n. 1 (C.A.3 1987); *United States v. Bonnette*, 663 F.2d 495, 497 (C.A.4 1981), cert. denied, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982); *United States v. Thompson*, 811 F.2d 841, 844 (C.A.5 1987); *United States v. Spears*, 49 F.3d 1136, 1141 (C.A.6 1995); *United States v. Staniforth*, 971 F.2d 1355, 1358 (C.A.7 1992); *Theron v. United States Marshal*, 832 F.2d 492, 496-497 (C.A.9 1987), cert. denied, 486

14

Because actual reliance is not required, the false statement offense under Section 1014 is complete at the point in time that it is made to a duly authorized bank representative. At that point, the crime is complete, and anything else that flows from the crime may be admissible as evidence of the charged offense, but such does not directly relate to the essential elements of the statute. If, on the other hand, actual reliance were required, the Government would be correct that venue would properly lie in the District of Delaware, as the place where the loan committee relied upon the allegedly false statements and approved the loan. However, since the ultimate actions of the loan committee are irrelevant to the charged offense, there is simply no element of the crime that took place in Delaware. In this case, the offense was complete when Yao made the allegedly false statements to Kevin Boyer in the Eastern District of Pennsylvania.

It is also significant to a determination of proper venue that Section 1014 does not require materiality. Wells, 519 U.S. at 482. The Supreme Court in United States v. Gaudin, 515 U.S. 506, 509 (1995), in defining materiality, stated that "material statements are those that have a natural tendency to influence, or are capable of influencing, the decision of the decisionmaking body to which it was addressed." So defined, the concept of materiality involves the effect, or potential effect, that a false statement has on a certain decision or result. Therefore, where a fraud or false statement statute has materiality as an element, such as a false statement under Section 1001, see United States v. Candella, 487 F.2d 1223 (2d Cir. 1973), or false

_____

U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); *United States v. Haddock*, 956 F.2d 1534, 1549 (C.A.10), cert. denied, 506 U.S. 828, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992); *United States v. Rapp*, 871 F.2d 957, 964 (C.A.11), cert. denied *sub nom. Bazarian v. United States*, 493 U.S. 890, 110 S.Ct. 233, 107 L.Ed.2d 184 (1989) (all holding materiality to be an element of § 1014), with *United States v. Cleary*, 565 F.2d 43, 46 (C.A.2 1977) (concluding that materiality is not an element), cert. denied *sub nom. Passarelli v. United States*, 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978)". Wells, 519 U.S. at 486, n. 3.

15

statements for the purpose of the Mail Fraud, Wire Fraud, or Bank Fraud Statutes, under Sections 1341, 1343 and 1344 respectively, see Neder v. United States, 527 U.S. 1 (1999), the Court may properly look to the effect on a certain decision-maker, and view the offense as continuing in nature until such time as a decision is made.

Conversely, a statute lacking materiality as an essential element, such as Section 1014, causes any potential result, consequence or effect to be irrelevant. Therefore, in regard to venue, the offense simply does not continue to the point of a decision being made or a decision-maker being influenced. Instead, the offense ends once the statement is made to the bank representative.

This Court is urged to follow the rationale of the First Circuit's decision in Salinas, 373 F.3d at 161, which examined a statute analogous to Section 1014 and concluded that venue was proper only in the district where the defendant made the false statement.  In Salinas, defendant was charged with passport fraud, under Title 18, United States Code, Section 1542, which provides that:

Whoever willfully and knowingly makes any false statement in an
Application for passport with intent to induce or secure the issuance
of a passport under the authority of the United States, either for his own
use or the use of another, contrary to the laws regulating the issuance
of passports or the rules prescribed pursuant to such laws

In that case, Mr. Salinas , a native of Ecuador, appeared in person at a post office in Brooklyn, New York which served as a passport application intake station.  The defendant met with a postal employee and completed the necessary paperwork.  As proof of U.S. citizenship, Salinas provided a fictitious New Jersey birth certificate, and then falsely swore to the truth of the information provided.  The post office in Brooklyn then forwarded the application to a bank in Pittsburgh, Pennsylvania, which had a

16

contractual arrangement with the Government to enter data from the applications into the State Department's computer system. The bank then routed the application to a national passport center in New Hampshire, where a passport specialist suspected fraud and commenced the investigation leading to Salinas' indictment by a Grand Jury, and to an eventual plea of guilty[7] in the District of New Hampshire. Salinas, 373 F.3d at 163.

The First Circuit, considering this issue as one of first impression, conducted the analysis urged by the Supreme Court in Rodriguez-Moreno, 526 U.S. at 275 and Cabrales, 524 U.S. at 1. The court examined the relevant text of the passport statute, and distilled it to two elements: "(i) the making of a false statement, (ii) with the intent to secure the issuance of a passport." Salinas, 373 F.3d at 165. Based on the text of the statute, the court concluded, "(w)e think it follows that passport fraud is complete at the moment an applicant makes a knowingly false statement in an application with a view toward procuring a passport...At that point in time, the applicant has violated the statute and, therefore, committed the crime." Id.[8]

This same analysis was used for the crime of forgery. See United States v. Jaynes, 75 F.3d 1493 (10th Cir. 1996). "(F)orgery is not a continuing offense for venue purposes, on the theory that the forging and uttering of a check is complete when the check is presented for payment." Jaynes, 75 F.3d at 1507; see United States v. Rodriguez, 465 F.2d 5, 10-11 (2d Cir. 1972).

---

[7] The defendant entered a conditional plea, pursuant to Fed. R. Crim. P. 11(a)(2), allowing defendant to raise the venue issue before the First Circuit.

[8] The Court noted that there are different types of passport fraud, some of which are more continuing in nature than others. The Court, therefore, confined its analysis to the specific theory of fraud charged by the Government in that case.

17

The Ninth Circuit's decision in Angotti, 105 F.3d at 539, is both factually distinct

from the instant case, and, for reasons developed below, is of slight persuasive value.

In Angotti, defendant argued that venue over the Section 1014 violations against him

could not lie in the Central District of California. The U.S. Court of Appeals for the Ninth

Circuit ultimately found that venue in the Central District of California was proper. In that

case, defendant made false statements in order to obtain a $480,000 loan from Western

Federal Savings and Loan Association (hereinafter "Western"). In applying for this loan,

Angotti submitted a draft loan application, containing false information, to an entity

called Guarantee Mortgage (hereinafter "Guarantee"), described as "an innocent

middle agent," which is located in the Northern District of California. Guarantee then

reiterated the false information to a branch office of Western located in the Northern

District of California. Western's branch office conditionally approved the loan and then

sent the application for a final decision to Western's headquarters, located in the Central

District of California.

After reviewing the application, Western informed Guarantee that Angotti would

have to provide a certificate of deposit to confirm certain assets. Angotti then contacted

an associate[9] in the Central District of California to prepare this verification of deposit.

The verification was then sent to Guarantee, which sent it to Western's branch office in

the Northern District of California, which in turn directed it to Western's headquarters in

the Central District of California.

Given the specific facts presented, the Ninth Circuit concluded "that venue was

therefore proper in the Central District, where the communication reached the audience

---

[9] The Court's opinion identifies this person as "Raymond Arthun" but does not indicate if he is associated
with Guarantee or Western or some other entity.

18

whom it was intended to influence, even though some of the criminal conduct occurred in the Northern District where the statements were submitted." Angotti, 105 F.3d at 542. As an initial observation, the facts before the Court in Angotti are distinct from those here. First, Angotti specifically contacted Raymond Arthun within the Central District of California in order to prepare a verification of deposit, which was critical to the approval of the loan. This purposeful contact directed at the District seeking venue by the defendant in Angotti makes it distinct from the facts of this case. Second, since Western's headquarters sought additional information from the defendant, the defendant was on specific notice that his application was being considered not by the branch office in the Northern District of California, but by the bank's headquarters in the Central District. In the present case, there is no indication that Yao knew anything about the process employed by Wilmington Trust of Pennsylvania to process his loan application, including where this approval would ultimately be made. For these reasons, even if this Court is persuaded by the reasoning of Ninth Circuit's Angotti decision, it is factually distinct from the facts here and is therefore of little value.

In addition to being factually distinct, the Angotti decision is of dubious precedential value for three reasons. First, it was decided in 1997, prior to the Supreme Court decisions in Rodriguez-Moreno and Cabrales, decided in 1999 and 1998 respectively, which refined the analysis to be made by courts in determining venue. The Ninth Circuit in Angotti relied on the so-called "key verb" test of determining venue. See Angotti, 105 F.3d at 543. "That test directs the court to make venue determinations by looking to the 'key verbs in the statute defining the criminal offenses to find the scope of relevant conduct.'" Id. quoting United States v. Corona, 34 F.3d 876, 879 (9th Cir.

1994). In Rodriguez-Moreno, 526 U.S. at 280, the Supreme Court, in finding that the
"key verb" test should be abandoned as a manner of determining venue, stated, "we
have never before held, and decline to do so here, that verbs are the sole consideration
in identifying the conduct that constitutes an offense. While the 'verb test' certainly has
value as an interpretative tool, it cannot be applied rigidly, to the exclusion of other
relevant statutory language." Therefore, since Angotti applied a test for determining
venue that has since been explicitly modified by subsequent Supreme Court decisions,
it is of questionable persuasive value in the instant case.

Second, Angotti[10] seems to have been limited in its applicability by a subsequent
Ninth Circuit decision, United States v. Marsh, 144 F.3d 1229 (9th Cir. 1998). Marsh
involved the prosecution of tax protestors. Among many other offenses, the protestors
were charged with filing baseless liens to harass government officials. Id. at 1241. The
liens were filed in Nevada and Washington to allegedly harass officials in the Eastern
and Northern Districts of California. Additionally, the liens were mailed from the Eastern
District of California. The Government, invoking Angotti, argued that the liens had an
impact on the IRS officers in San Jose conducting the investigation and that venue in
the Northern District of California was appropriate. The Court rejected the
Government's argument, finding that the "crime of endeavoring to impede the IRS is
complete when the endeavor is made. The government did not have to show that its

[10] Angotti, Id. at 543 claims support from three cases: United States v. Greene, 862 F.2d 1512 (11th Cir. 1989); United States v. Zwego, 657 F.2d 248 (19th Cir. 1981); and United States v. Ruehrup, 333 F.2d 641 (7th Cir. 1964). However, these cases are factually distinct because they address the issue of when an offense under Section 1014 begins, and not when it ends. These three decisions are so-called "preparation" cases, dealing with the issue of when a defendant, by making certain preparations to commit a crime, actually commences the commission of an offense for the purposes of venue. They shed no light on the question presented in the instant case, or indeed on that presented in Angotti, of whether the offense continues past the point of an alleged misrepresentation being made to a bank official.

20

agents abandoned their investigation or even that the agents were anxious about the effect of the liens of their credit. No effect need be proven. The filing of the lien is the crime." Id. at 1242. These observations by the Marsh court suggest that the Angotti court believed that a violation of Section 1014 was not complete until a certain result was achieved, such as inducing actual reliance by a bank. Otherwise, there would be no reason for the Marsh court to distinguish the lien offense from the Section 1014 offense by pointing out that the lien offense does not require any effect to be proven.

This raises the third problem with the Angotti decision, specifically that it was reached a month before the Supreme Court's decision in United States v. Wells, 510 U.S. 482 (1997), which established that materiality was not an element of a Section 2014 violation. When one reads Angotti in conjunction with Marsh, one reaches the inescapable conclusion that the Angotti decision was based on the faulty premise that a Section 1014 offense is not complete until the decisionmaking body is, or could be, influenced by the misrepresentation. Indeed, at the time Angotti was decided, it was widely believed such was the law. Prior to the decision in Wells, the majority of Circuit Courts, including the Ninth Circuit, believed that Section 1014 required a material misrepresentation, see Wells, 519 U.S. at 485, n. 3 (setting forth those Federal Court of Appeals that had held materiality to be an element of a Section 1014 offense), or one that had "a natural tendency to influence...the decision of a decisionmaking body..." United States v. Gaudin, 515 U.S. 506, 509 (1995). Once the materiality element is eliminated from the statute, then under Cabrales and Rodriguez-Moreno, the crime is complete not when the misrepresentation reaches the ultimate decision-maker, but when it is made to the bank representative.

21

Indeed, the dissent in Angotti questioned the majority opinion by noting, "(t)he majority bases its holding upon its characterization of the Section 1014 crime as one that 'continues until the communication is received by the person or persons whom it is intended to affect or influence' see maj. Op. at 543. However, the majority cites no authority – Ninth Circuit or otherwise – for the proposition that fraudulent statements …(under Section 1014) are not received by that institution until they find their way to the individual officers with authority to act upon them." Angotti, 105 F.3d at 546 (Norris, J. dissenting).

For these reasons, this Court is urged to follow the reasoning of Salinas, 373 F.3d at 161, rather than that of Angotti, 105 F.3d at 539, and conclude that the Section 1014 offenses relating to Wilmington Trust of Pennsylvania (Counts 1 and 3) may not be prosecuted in the District of Delaware.

## POINT 2

### COUNT 12 SHOULD BE DISMISSED BECAUSE THE GOVERNMENT CANNOT PROVE THAT THE $15,500 WIRED BY MR. YAO TO PAY HIS CREDIT CARD BILL IS PROPERTY DERIVED FROM FRAUD

The allegedly unlawful monetary transaction in Count 12 indirectly relates to the wire fraud charged in Count 10. Count 10 charges that Mr. Yao defrauded Wachovia bank in connection with the refinance of a home located in Nantucket, within the District of Massachusetts. During the course of this fraud, a wire transmission was allegedly sent, such that the Wachovia fraud is charged as a wire fraud, in violation of 18 U.S.C., Sec. 1343.

The Indictment then charges two separate financial transactions, charged as Counts 11 and 12 respectively, involving proceeds of the Wachovia wire fraud charged

in Count 10. Counts 11 and 12 are charged as violations of Section 1957. Significantly, the Government is not alleging that Mr. Yao sought to launder any of the money related to the alleged Wachovia fraud, nor that Mr. Yao had the criminal intent to violate any of the other provisions of 18 U.S.C., Sec. 1956. Instead, the Government charges merely that he transferred the money that he allegedly received as a result of the charged Wachovia bank wire fraud. Specifically, Count 11 charges that on or about June 26, 2002, Mr. Yao caused a Nantucket Bank employee to wire transfer $990,426.98, proceeds related to the fraud in Count 10, from a Glidden & Glidden account maintained at Nantucket Bank to a Citizen/Mellon Bank Account controlled by Mr. Yao and his wife. The Indictment alleges that this activity took place in the Eastern District of Pennsylvania.

Count 12 then charges that on July 12, 2002, a $15,500 online payment was made from the Citizen/Mellon Bank Account to a MBNA America MasterCard Account, reflecting the fact that Mr. Yao was simply paying his credit card bill. Count 12 alleges that the activity underlying it took place within the District of Delaware because the MasterCard Account was maintained at MBNA Americas offices in Wilmington, Delaware.[11]

In a nutshell, the Government charged Mr. Yao with an unlawful financial transaction for wiring the $990,426.98 into his Citizen/Mellon Account, and then charged him with a second unlawful financial transaction when he paid his credit card bill with the money from that account. However, based on information and belief, the

---

[11] The facts underlying the Section 1957 counts were provided by IRS Special Agent Thomas Winterbottom during his February 28, 2006 Grand Jury testimony. S.A. Winterbottom testified before the Grand Jury several times. Unless otherwise noted, all references relate to his February 28, 2006 testimony.

Citizen/Mellon Account contained deposits far in excess of the $990,426.98 wired into

the bank from the allegedly fraudulent Nantucket house refinance. See Affidavit of Marc

Agnifilo, Esq. Therefore, the Government is simply unable to prove that the funds sent

to pay the credit card bill were in any way derived from the alleged Wachovia Bank wire

fraud allegation.

Defendant is aware of the inconsistency in the law on the subject of commingled

funds in the context of an allegation under Section 1957. However, given the small size

of the defendant's credit card payment and the large amount of money in the account,

only a fraction of which derived from the Nantucket refinance, it is the defendant's

position that the Government cannot prove this charge beyond a reasonable doubt.

Therefore, dismissal is appropriate at this juncture.[12]

The most pertinent Third Circuit case in this area is United States v. Sokolow, 91

F.3d 396 (3d Cir. 1996). In Sokolow., the defendant claimed on appeal that the district

court committed plain error in the jury instruction on the "element of Sec. 1957 that

requires the criminally derived property in a monetary transaction to have a value in

excess of $10,000." Id. at 409. The Third Circuit ultimately found that a jury instruction

containing the specific charge that "'(i)t is sufficient if the Government proves at least

part of the property represents such proceeds (of money laundering)" was not plain

error, and affirmed the conviction. It is respectfully submitted that because the Third

Circuit was conducting a plain error analysis of the jury charge, it did not have a reason

in Sokolow to conduct a thorough analysis of this issue. Accordingly, rather than the

decision in Sokolow being viewed as a definitive statement by the Third Circuit on this

---

[12] In the event the Court does not dismiss Count 12 at this juncture, the defendant wishes to preserve this issue and ensure an appropriate jury charge at the proper time on the subject of the government's burden in proving a 1957 violation when funds have been commingled.

point, it should be confined to the specific facts of that case. However, there have been decisions from other Circuits that have addressed the issue far more directly and have given it more extensive treatment.

In United States v. Loe, 248 F.3d 449 (5th Cir. 2001), the Court adopted a test to determine whether a 1957 charge could be maintained where the source of specific funds was not provable. The Court stated "that where an account contains clean funds sufficient to cover a withdrawal, the Government cannot prove beyond a reasonable doubt that the withdrawal contained dirty money." Id. at 467. In Loe, the Court faced a situation where about $470,000 in fraudulently-obtained money entered an account containing over $2,200,000. The Government charged a series of unlawful transactions during which a total of about $776,742 was transferred out of the account. The issue was whether it could be proven that the $776,742 were proceeds of the initial fraud. The Court held that "no reasonable juror could conclude that these money laundering convictions were warranted beyond a reasonable doubt." Id. at 467,

The decision in Loe finds support in United States v. Rutgard, 108 F.3d 1041 (9th Cir. 1997). In Rutgard, the Court explicitly denied to create a presumption "that any transfer of cash in an account tainted by the presence of a small amount of fraudulent proceeds must be a transfer of these proceeds." Id. at 1063. As a result, the Court found that the Government "could not prove that any fraudulently-derived proceeds left the account." Id. The Court also made a number of observations of the applicability of the Section 1957 offense that are particularly germane to Count 12, where it is agreed Mr. Yao was doing nothing more than paying his credit card bill from his bank account. Because the statute does not require criminal intent, the Court likened it to "a type of

25

regulatory crime," Id. at 1062, which is also a "draconian law," made even more so by "its elimination of criminal intent." As a result, the Court distinguished a 1957 offense from traditional money laundering under 1956, stating "we do find helpful in interpreting Sec. 1957 the cases applying Sec. 1956." Id.

The Ninth Circuit approach was not adopted by the Seventh Circuit in United States v. Haddad, 426 F.3d 783 (7th Cir. 2006), which analogized Sections 1956 and 1957, and held that the government did not need to trace every dollar of income and connect it to a specific instance of laundering. It is submitted that due to the essential difference between 1956 and 1957, specifically that the former involves an actual intent to disguise the nature of the funds, whereas the later requires no such intent, and indeed requires no criminal intent whatsoever, that the Loe, 248 F.3d at 449 and Rutgard, 108 F.3d at 1041 line of cases is more persuasive than the holding in Haddad, which misses this critical distinction.

The Court is therefore asked to follow the reasoning of Loe, 248 F.3d at 449 and Rutgard, 108 F.3d at 1041 and find that the Government cannot prove the allegation in Count 12 beyond a reasonable doubt.

## POINT 3

### THE HEADING "MONEY LAUNDERING " SHOULD BE REMOVED FROM COUNTS 11 AND 12

In regard to Counts 11 and 12, the Indictment's heading reads "Money Laundering." It is respectfully submitted that this label is simply inaccurate insofar as Mr. Yao is not charged with money laundering under those counts. The label "money laundering" is obviously appropriate for an allegation under Title 18, United States Code, Section 1956, entitled "Laundering of Monetary Instruments." However it is

inapposite to an offense under Section 1957. The defendant has no objection to the use of labels generally in the Indictment, so long as the label is the one used by Congress in naming the statute. The label used by Congress for a violation of Section 1957 is "Engaging in monetary transactions in property derived from specified unlawful activity." If the Government wishes to label Counts 11 and 12, it should clearly use the name given the statute by Congress.

Money laundering has an entirely different meaning, and is an entirely different statute, with different criminal elements and a degree of criminal intent simply not present in a violation of Section 1957. Plainly, there is no allegation in either Count 11 or 12 that Mr. Yao laundered money. He did not seek to disguise the nature of the transactions or of his association with these transactions. Nor did he engage in these transactions in an effort to perpetuate other criminal activity. Indeed, there is no allegation or evidence suggesting otherwise. Instead, Mr. Yao is accused in those counts of engaging in monetary transactions that, aside from the allegedly fraudulent source of the funds, were entirely legitimate. Had Mr. Yao intended to launder the money gained during the allegedly fraudulent conduct alleged in Count 10, there is no doubt the Government would have charged him with actual money laundering, in violation of Section 1956, in Counts 11 and 12. However, since it has not, the money laundering labels should be removed from Counts 11 and 12.

## POINT 4

## THE GOVERNMENT SHOULD DISCLOSE BRADY AND GIGLIO MATERIAL

Federal Rule of Criminal Procedure Rule 16(a) requires the Government to disclose various information and items of evidence "[u]pon request of the defendant."

Moreover, Brady v. Maryland, 373 U.S. 83, 87 (1963), and its progeny, mandates that a criminal defendant's right to due process of law forbids a prosecutor from withholding "evidence favorable to an accused upon request where the evidence is material whether to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

## POINT 5

### THE COUNT SHOULD ORDER THE GOVERNMENT TO PROVIDE PRIOR STATEMENTS UNDER 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2

Title 18 U.S.C. § 3500 requires the Government, "on motion of the defendants," to disclose a Government's witness's prior statements that are in the Government's possession and relate to the subject matter of the witness's direct testimony. See also Fed. R. Crim. P. 26.2. Counsel for Mr. Yao makes this request now in light of the Court's preference for a smooth and orderly trial. Counsel is aware of the practice in this Court to direct 3500 material be provided far enough in advance to permit meaning confrontation and cross examination and requests that such an order be entered in this matter.

## POINT 6

### ANDREW YAO REQUESTS PERMISSION TO MAKE ADDITIONAL MOTIONS THAT MAY BECOME NECESSARY AS A RESULT OF FURTHER DISCOVERY

Counsel for Mr. Yao anticipates that additional motions may become necessary as discovery in this case progresses. Accordingly, counsel respectfully requests permission to file such additional motions if and when their necessity becomes apparent.

28

## IV.    CONCLUSION

For the reasons discussed herein, Mr. Yao respectfully requests that Counts 1 –

11 de dismissed for insufficient venue in the District of Delaware; that Count 12 be

dismissed; that the title of money laundering be removed from the Section 1957

offenses in Counts 11 and 12; that the Court order the Government to turn over the

requested and required discovery; and that he be permitted to make additional motions

that may become necessary as a result of further discovery.

Respectfully submitted,

MARC AGNIFILO
BRAFMAN & ASSOCIATES, P.C.
*Attorney for Andrew N. Yao*
767 Third Avenue, 26th Floor
New York, New York 10017
(212) 750-7800

Dated:  New York, New York
        October 11, 2006

TO:

Honorable Gregory M. Sleet
Benjamin Brafman, Esq.
AUSA Shannon Hanson
Clerk of the Court
Andrew N. Yao