## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>ANDREW N. YAO,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)  Criminal Action No. 06-27-GMS<br>)<br>)<br>)<br>) |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF APPLICATION OF U.S.S.G. SECTION 2B1.1 IN CALCULATING THE DEFENDANT'S ADVISORY GUIDELINE RANGE

The United States of America, by its attorneys, Colm F. Connolly, United States Attorney for the District of Delaware, and Shannon T. Hanson and Douglas E. McCann, Assistant United States Attorneys, and respectfully files this Memorandum in support of application of United States Sentencing Guideline ("U.S.S.G.") Section 2B1.1 in calculating the defendant's advisory Guideline Range as the guideline most applicable to the offense and to account, *inter alia*, for the losses to victim, Student Finance Corporation, resulting from the defendant's conduct. Application of U.S.S.G. Section 2B1.1 to the defendant's conduct also satisfies the sentencing factors set forth in 18 U.S.C. Section 3553(a), as described herein.  In support, counsel avers as follows:

## I.    Procedural Background

1.    On March 14, 2007,  defendant Andrew Yao ("Yao") was convicted of two counts of bankruptcy fraud, in violation of 18 U.S.C. Section 152(2). Docket Item ("D.I.") 45.  On August 28, 2006, the Probation Office sent Yao's draft Presentence Investigation Report ("Draft

PSR #1") to the parties, requesting responses on or before September 12, 2007, in time for the

then-scheduled September 26, 2007, sentencing date.

2.    In Draft PSR #1, the probation office calculated the defendant's applicable U.S.S.G.

Guideline range of imprisonment under U.S.S.G. Section 2B1.1. Application of Guideline

Section 2B1.1 to the defendant's conduct of conviction, without an obstruction enhancement

under U.S.S.G. Section 3C1.1, resulted in a total offense level of 22. Draft PSR #1 at ¶¶ 38 &

76. With a Criminal History Category I, Yao's advisory Guideline range of imprisonment, with

the Section 3C1.1 obstruction enhancement, was 51-63 months. *Id.* at ¶76.

3.    By letters dated September 12, 2007, the parties responded to Draft PSR #1.

Consistent with this Court's practice, those letters were addressed directly to the probation office

and were not docketed with the Court. In his letter, the defendant objected to use of U.S.S.G.

Section 2B1.1 as the relevant Guideline for his convictions, arguing instead for the Court's use of

U.S.S.G. Section 2J1.3.

4.    In a subsequent telephone call with the probation officer, the parties were informed

that the Court agreed with the defendant's objection and asked the probation office to revise

Draft PSR #1 to recalculate the defendant's advisory Guideline sentence under U.S.S.G. Section

2J1.3.

5.    Thereafter, on September 20, 2007, the government moved for a continuance of the

sentencing hearing and a scheduling conference with the Court. D.I. 54. That motion was

granted in part, D.I. 56, and the sentencing was twice rescheduled. D.I. 56, 58.

6.    On October 15, 2007, the revised draft PSR ("Draft PSR #2") was provided to the

parties. Applying U.S.S.G. Section 2J1.3 to the defendant's conduct of conviction, with an

obstruction enhancement under U.S.S.G. Section 3C1.1, resulted in a total offense level of 16. *See* Draft PSR #2 at ¶¶ 31-41. With a Criminal History Category I, Yao's advisory Guideline range of imprisonment under Draft PSR #2 was 21-27 months. *See id.* at ¶ 79.

7. The government timely filed its objections to Draft PSR #2 on October 24, 2007, and on that same day sent a sentencing letter with the Court specifically objecting to application of U.S.S.G. Section 2J1.3 in the defendant's case.

8. After telephone calls and electronic mail correspondence with the parties on October 29 and 30, 2007, the probation office determined that use of the 2006 Guideline Manual presented *ex post facto* problems if U.S.S.G. Section 2J1.3 was applied to the defendant's conduct.[1] Accordingly, on October 30, 2007, the probation officer informed the parties that the PSR would be further revised to reflect use of the 2002 Guidelines Manual, in effect at the time of the defendant's criminal conduct, instead of the manual in effect on the date of sentencing. *See* U.S.S.G. Section 1B1.11.[2]

9. The probation officer noted in both draft PSRs that restitution of $819,000 must be ordered in this case, pursuant to 18 U.S.C. § 3663A. *See* Draft PSR #1 at ¶ 83 and Draft PSR #2 at ¶ 86. This figure is explained in the "Victim Impact" section of the draft PSRs, where it states that "[t]he Mandatory Restitution Act applies to the counts of conviction. The funds under investigation in the deposition total $819,000. Restitution is due to Student Finance Corporation

---

[1] No such *ex post facto* issues would arise if the Court applied U.S.S.G. Section 2B1.1.

[2] Use of Section 2J1.3 as set forth in the 2002 Guidelines Manual results in an total offense level of 14 and a advisory guideline range of imprisonment (assuming a Section 3C1.1 enhancement for obstruction of justice) of 15-21 months.

through the trustee, Charles A. Stanziale." Draft PSR #1 and #2 at ¶ 18.

    10.    On November 5, 2007, the Court issued an Order directing the parties to submit simultaneous briefs "with regard to whether the Court should apply U.S.S.G. § 2B1.1 or U.S.S.G. § 2J1.3 in calculating the defendant's advisory Sentencing Guideline range." D.I. 59. The Court also continued the defendant's sentencing hearing. *Id.*

    11.    On November 9, 2007, defense counsel filed a letter indicating that the parties would simultaneously submit their briefs on the guideline issue by November 16, 2007. D.I. 60. Due to defense counsel's acute illness on November 16, 2007, the parties agreed to submit their briefs on November 19, 2007, as defense counsel set forth in his November 16, 2007, letter to the Court.

## Argument

## II.    This Court Should Apply U.S.S.G. Section 2B1.1 In Calculating The Defendant's Advisory Sentencing Guideline Range.

### A.    The Advisory Sentencing Guidelines Play An Integral Part In Sentencing Under 18 U.S.C. Section 3553(a).

    12.    Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are now advisory. However, "[t]he Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country." *United States v. Cooper*, 437 F.3d 324, 331 (3d Cir. 2006)(citations and quotation marks omitted). The Third Circuit has further noted that the Sentencing Guideline range - itself one of the Section 3553(a) factors that a district court must consider - continues to play an "integral part" in sentencing decisions. *Id.*; *see also United States v. Tomko*, 498 F.3d 157, 165 (3d Cir. 2007)(noting that the Sentencing Guidelines "continue to be a vital force in sentencing as they 'reflect a rough

approximation of sentences that might achieve [Section] 3553(a)'s objectives"')(*citing Rita v. United States*, 127 S.Ct. 2456, 2458 (2007)). As such, the U.S.S.G. range provides a "natural starting point for the determination of the appropriate level of punishment for criminal conduct." *Cooper*, 437 F.3d at 331 & n.10; see also *United States v. Lloyd*, 469 F.3d 319, 323 (3d Cir. 2006).

13.    The determination of the correct guideline range as a "natural starting point," *Cooper*, 437 F.3d at 331, is critical in this case. As described above, there is a substantial disparity between the ranges set forth in U.S.S.G. Sections 2J1.3 and 2B1.1 – a disparity reflective, as set forth below, of the distinction between lying under oath generally, and lying under oath in the context of a bankruptcy proceeding, where those lies were used by the defendant in an effort to perpetrate a fraud on the bankruptcy court and on his creditors.

**B.    Section 2B 1.1 Specifically Covers Misrepresentations In A Bankruptcy Proceeding.**

14.    The first step this Court must take in calculating the defendant's advisory Guideline range is to determine the offense guideline section applicable to his offenses of conviction, *i.e.,* the offense conduct charged in the Counts 13 and 14 of the Indictment. *See* U.S.S.G. Section 1B1.2(a). Section 2B1.1 is the general Guideline section for most economic crimes, encompassing a large and diverse group of property, fraud, and forgery offenses. *See* U.S.S.G. Appendix A (cross-referencing 291 federal statutes which use Section 2B1.1 to govern the Guidelines offense level).[3] Under Section 2B1.1, the applicable Guideline range is

___

[3]Prior to November 2001, "theft" (Section 2B1.1) and "fraud" (Section 2F1.1) crimes were covered by different guidelines. In November 2001, the Sentencing Commission consolidated the "theft" and "fraud" guidelines into the single "economic loss" guideline of Section 2B1.1. *See* U.S.S.G. App. C, amdt. 617.

determined by focusing on the amount of loss that the defendant's criminal conduct caused the victim.

15.     The jury convicted the defendant for violating 18 U.S.C. Section 152(2) which reads as follows:

> A person who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 . . . shall be fined under this title, imprisoned not more than 5 years, or both.

U.S.S.G. Section 2B1.1(b)(8) specifically references conduct such as the defendant's:

> (8) If the offense involved . . . (B) a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding . . . increase by 2 levels.

16.     Subsection (b)(8) was added effective November 1, 2000 (to what was then U.S.S.G. Section 2F1.1), to address a circuit conflict over whether a sentencing enhancement found in then Section 2F1.1 for violation of "any judicial or administrative order, injunction, decree or process" applies to false statements made during bankruptcy proceedings. *See* U.S.S.G., Appendix C, Amendment 597, attached as Exhibit A hereto. The Sentencing Commission added what is now Subsection 2B1.1(b)(8) to address that conflict, stating:

> This amendment creates a separate and distinct basis for a two-level enhancement under the fraud guideline for a misrepresentation or false statement made in the course of a bankruptcy proceeding. Additionally, the existing enhancement and its accompanying commentary are modified to make clear that, in order for the enhancement to apply in a fraud case not involving a bankruptcy proceeding, there must be a false statement in violation of a specific, prior order. Therefore, any case involving a bankruptcy fraud will result in a two-level enhancement, but in the case of a non-bankruptcy fraud, the enhancement will apply only if a defendant was given prior notice of a particular action. **The Commission has decided to treat bankruptcy fraud more severely because of its adverse impact on the bankruptcy judicial process and because of the additional harm and seriousness involved in such conduct.** *See United States v. Saacks*, 131 F.3d 540, 543 (5th Cir. 1997) (noting that bankruptcy fraud is more serious than "the most pedestrian federal fraud offense").

*Id.* (Emphasis added).

17.     The defendant's lies were told in the context of the bankruptcy of his company,

Student Finance Corporation ("SFC"). Accordingly, this Court should apply the guideline

section specifically intended to address misrepresentations and false statements in a bankruptcy

case, and not the general perjury guideline that does not refer to bankruptcy proceedings at all.

**C.      The Defendant's Misrepresentations In Connection with SFC's Bankruptcy Were An Effort To Perpetrate A Fraud On The Bankruptcy Court and SFC's Creditors.**

18.     The evidence at trial overwhelmingly demonstrated – as he himself admitted –

that the defendant testified falsely about his distribution of SFC's assets during a deposition

taken in the course of the SFC bankruptcy case by one of SFC's creditors, Royal Indemnity

Company ("Royal"). That August 28, 2003, deposition was taken in connection with efforts by

Royal (a) to determine whether the defendant should remain in control of SFC as

debtor-in-possession and (b) to find recoverable assets that could be brought back into SFC's

estate for the benefit of creditors.

19.     The defendant was the President and sole shareholder of SFC for most of its

existence. As the government argued during its closing, the defendant had many reasons to lie

about his dissipation of SFC's assets on an expensive extra-martial affair and on gambling.

However, the evidence at trial established that a key reason for the defendant's lies was to

maintain control of SFC during the pendency of the bankruptcy. At the time of his deposition,

the defendant knew that Royal had filed a motion asking the bankruptcy judge to appoint an

independent trustee to run SFC, or, in the alternative, to liquidate SFC's assets. At the deposition

itself, the defendant testified that over $600,000 in SFC's assets given to Alexandria Karlsen

were disbursed for "aircraft maintenance" – that is, an expense that a creditor would assume to be business-related and appropriate. The defendant further testified at that August 28, 2003, deposition that SFC assets directed to Las Vegas casinos were for the benefit of his family members and were specifically "authorized during the . . . budgeting process." *See* Trial Transcript ("TT") at 195-96. The defendant's false testimony was designed to lull the creditors and the bankruptcy judge into thinking that the defendant was a good steward of SFC.

20.     Tellingly, the defendant affirmatively used his deposition lies to further perpetrate his fraud on the bankruptcy court. In a September 2, 2003, Declaration filed with the bankruptcy court, the defendant reiterated his lies about the purpose of the $150,000 in SFC funds he spent on gambling as charged in Count 14. *See* Government's Trial Exhibit ("GX") 4, attached hereto as Exhibit B. In that Declaration, at paragraph 18, the defendant declared under penalty of perjury:

> I understand that Royal, in support of its Motion, has relied on a transfer made to the Bellagio Hotel and Casino in Las Vegas, Nevada in February, 2002. I requested that the distribution be made to that location rather than to my personal account for the benefit of my family and, specifically, my grandfather. A very small portion of that distribution may have paid for my room and board at the hotel, as I have stayed there in the past. The distribution of equity was not in any way related to gambling debt incurred by me, as I do not gamble.

21.     GX 4 was provided to the bankruptcy judge for one reason - to persuade that judge that the defendant was a good steward of SFC, and, accordingly, SFC should remain as debtor-in-possession. GX 4 was the culmination of the defendant's efforts to use his deposition testimony to deceive that judge and SFC's creditors about his malfeasance while SFC's CEO and President. That these efforts ultimately were aborted as futile does not change the fact that the fraud guideline specifically drafted to cover misrepresentations in the course of a bankruptcy

proceeding (2B1.1), and not the general perjury guideline, is the appropriate starting point in determining the defendant's sentence.

22.     An additional effect of the defendant's false statements, as demonstrated by the government at trial, was to hinder SFC's creditors from recovering these assets in SFC's bankruptcy proceeding. Alan Gilbert, Royal's attorney who took the deposition leading to the defendant's present convictions, testified at trial that a purpose of the deposition was to locate assets that could be recovered for the benefit of creditors. *See, e.g.*, GX 6 (Rule 30(b)(6) notice for defendant's deposition, attached hereto as Exhibit C); TT at 182 (Gilbert testified that the defendant knew he was there to testify about Sections 9 and 14 of his deposition notice which concerned SFC's assets and Yao's shareholder distributions); TT at 196 (Gilbert testified that the defendant's testimony during the deposition -- that SFC assets forwarded to casinos were authorized in the ordinary course of business -- left the impression that these were not funds that could be recovered by the bankruptcy estate for the benefit of creditors such as Royal).

23.     The jury did not need to find that the defendant intended to defraud SFC's creditors, the bankruptcy court, and others with his lies in order to convict him under Section 152(2). *See United States v. Gellene*, 182 F.3d 578, 586 (7th Cir. 1999). Nevertheless, this Court – as the fact finder for sentencing purposes – can and, respectfully, should find, by a preponderance of the evidence presented at trial, that the defendant's charged lies were an integral part of his scheme to defraud others and to maintain control of SFC. Indeed, the preponderance of the evidence presented at trial supports that conclusion, and the appropriateness of using U.S.S.G. Section 2B1.1 as the "natural starting point" for determining the defendant's advisory Sentencing Guideline range. *Cooper*, 437 F.3d at 331.

**D.    The Fraud Guideline Is Appropriate Because It Addresses Intended Loss To The Defendant's Victim, SFC.**

24.    $819,000 in loss to the victim, the bankruptcy estate of SFC, is attributable to the defendant's conduct. Draft PSR #1 at ¶ 83; Draft PRS #2 at ¶ 86. Had the defendant's lies in the August 28, 2003, deposition not been discovered, the estate would not have been able even to attempt recovery of these assets from Ms. Karlsen ($659,000) or the two casinos (the Bellagio and Mandalay Bay) to which Yao wired a total of $150,000. Yet this loss is not even considered if the defendant's advisory Sentencing Guideline range is calculated under U.S.S.G. Section 2J1.3. Indeed, U.S.S.G. Section 2J1.3 makes no provision for loss of *any* kind.

25.    A typical perjury charge, as opposed to a bankruptcy fraud charge under Section 152(2), does not have victims or loss associated therewith. By contrast, the defendant's lies here were targeted to result in third party losses, to SFC and/or to its creditors, thus making U.S.S.G. Section 2B1.1 the appropriate advisory guideline.[4]    Through his charged lies, the defendant intended to thwart lawful attempts by both SFC's creditors and SFC's estate to recover money the defendant personally spent on Karlsen and on gambling. SFC's Trustee in bankruptcy, Charles Stanziale, has attempted to recover funds from the three payees at issue. It is government counsel's understanding that, out of the hundreds of thousands of dollars the defendant spent and lied about, Mr. Stanziale has recovered approximately $5,000 to date, leaving losses in excess of

---

[4]    U.S.S.G. Section 2B1.1(b)(1) lists, as a specific offense characteristic, the loss attributable to an offense and increases the offense level based upon that loss "if the loss exceeded $5,000." Generally, the district court is required to impose the "greater of actual or intended loss." U.S.S.G. § 2B1.1, app. note 3(A). "Actual loss" consists of the "reasonably foreseeable pecuniary harm that resulted from the offense" – that is, the "pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* "Intended loss" is the "pecuniary harm that was intended to result from the offense." *Id.*

$814,000. Had the defendant's lies been successful, Mr. Stanziale would not have known that he could recover any funds at all. Accordingly, the losses associated with the defendant's conduct should be factored into his advisory sentencing guideline range under U.S.S.G. Section 2B1.1.[5]

### The Advisory Guideline Range Determined Through Use Of U.S.S.G. Section 2B1.1 Takes Into Account The Remaining 18 U.S.C. Section 3553(a) Factors

26.    Finally, application of U.S.S.G. Section 2B1.1 to the conduct of conviction results in a sentence that satisfies the remaining Section 3553(a) factors this Court is to consider when sentencing the defendant. First, the advisory Guideline range under U.S.S.G. Section 2B1.1 takes into account the nature and circumstances of the defendant's offense here – that he lied in connection with the bankruptcy of his company, SFC, in an attempt to thwart the bankruptcy process and to deceive the bankruptcy court and SFC's creditors. *See* 18 U.S.C. Section 3553(a)(1). When viewed in the context of the SFC bankruptcy as a whole, the defendant's crime is not "mere" perjury – it is part and parcel of his abuse of the bankruptcy system and of SFC's creditors. Indeed, the defendant's lies were told in connection with litigation (still ongoing) alleging a massive SFC fraud against lending banks resulting in hundreds of millions of dollars in loss. *See* Draft PSRs #1 & #2 at ¶¶ 5-8.

27.    Second, the sentence imposed by the Court "needs to reflect the seriousness of the offense, promote respect for the law, and provide just punishment." *See* 18 U.S.C. Section

---

[5] Indeed, even if this Court were to hold that U.S.S.G. Section 2J1.3 should be used to calculate the defendant's sentence, this loss should be factored into any advisory Guideline range. The present case is precisely the sort of situation the Sentencing Commission contemplated when it stated, in U.S.S.G. Section 5K2.0, that there may be specific offense characteristics under other guidelines that are "relevant factor[s] to sentencing under one of the other [here U.S.S.G. Section 2J1.3] guidelines."

3553(a)(2). Use of Section 2J1.3 results in an offense level of 12 (without the obstruction of justice enhancement) similar to the advisory offense level for defendants who cause between $30,000 and $70,000 in losses – hundreds of thousands less than the required restitution here. *Compare* U.S.S.G. 2J1.3 (2002) *with* U.S.S.G. Section 2B1.1(b)(1)(D). A sentence under Section 2J1.3 thus fails to reflect the seriousness of the losses caused by the defendant and fails to provide just punishment for his crimes. Moreover, sentencing the defendant under a guideline that neither accounts for nor enhances the defendant's punishment because of the context in which his lies were told, fails to promote respect for the very system the defendant abused.

28.    Third, the sentence imposed by the Court should "afford adequate deterrence to criminal conduct" and should "protect the public from further crimes of the defendant." 18 U.S.C. Section 3553(a)(2)(B)&(C). The split sentence proposed by the defendant under Section 2J1.3 accomplishes neither of these goals. By sentencing the defendant to less than a significant period of incarceration, the clear message sent to the defendant's intended victims, SFC's bankrupt estate and its creditors, is that the defendant could – and did – lie and repeat those lies to the bankruptcy court and nonetheless "get away with" a punishment typically reserved for those committing crimes with far less economic loss. The defendant's calculated abuse of the bankruptcy court system merits greater punishment.[6]

---

[6] The Court is aware that the defendant is facing additional charges in the Eastern District of Pennsylvania. *See* Draft PSR #2 at ¶¶ 2 and 45. These charges were originally brought in the District of Delaware, but were dismissed without prejudice on May 17, 2007. *See* D.I. 49 & 50. Should the defendant receive a sentence of incarceration here and be convicted on the outstanding Pennsylvania charges while serving that term of imprisonment, his ultimate sentence would be subject to the provisions of U.S.S.G. Section 5G1.3.

-12-

**III.    CONCLUSION**

29.     WHEREFORE, the government respectfully requests that this Court apply U.S.S.G. Section 2B1.1 to the defendant's convictions when calculating his advisory Sentencing Guideline range.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY:

Shannon Thee Hanson
~~Douglas E. McCann~~
Assistant United States Attorney
1007 Orange Street, Suite 700
Wilmington, Delaware 19899
(302) 573-6277 x128

Dated: November 19, 2007

-13-

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal Action No. 06-27-GMS |
| | ) |
| ANDREW N. YAO, | ) |
| | ) |
| Defendant. | ) |

### CERTIFICATE OF SERVICE

I hereby certify that two copies of the attached GOVERNMENT'S MEMORANDUM IN SUPPORT OF APPLICATION OF U.S.S.G. SECTION 2B1.1 IN CALCULATING THE DEFENDANT'S ADVISORY GUIDELINE RANGE were sent via EM/ECF and by first-class mail on November 19, 2007 to the following:

**Brian McMonagle, Esq.**
McMonagle Perri McHugh and Mischak
One Penn Square West, Suite 701
30 S. 15th Street
Philadelphia, PA 19102

**Mark E. Cedrone, Esq.**
Cedrone & Janove
Suite 940 Public Ledger Building
Sixth & Chestnut Streets
Philadelphia, PA 19106
(215) 925-2500
Fax: (215) 925-6471
Email: mcedrone@cedronejanove.com

**Counsel for Andrew N. Yao**

Mr. Walter P. Matthews, III, Esq.
Senior United States Probation Officer
J. Caleb Boggs Federal Building
844 King Street
Lockbox #39
Wilmington, DE 19801
(302) 252-2962

Shannon Thee Hanson
Assistant United States Attorney

**U.S. v. Andrew Yao Cr. No. 06-27**

# EXHIBIT A

conduct, which generally occurs within the context of financial and credit account take-overs, involves affirmative activity to generate or "breed" another level of identification means without the knowledge of the individual victim whose identification means are misused, purloined, or "taken over". This activity is considered more sophisticated because of the additional steps the perpetrator takes to "breed" additional means of identification in order to conceal and continue the fraudulent conduct. Such sophisticated conduct makes detection by both the individual and institutional victims much more difficult. It also has the potential to increase harm, both monetary and non-monetary, to the individual victims (about whom Congress was particularly concerned in enacting the ITADA), and can result in substantial disruption of record-keeping by governmental agencies and private financial institutions upon which the stream of commerce depends. Thus, the Commission determined that this aggravated offense conduct, in contrast to the most basic forms of identity theft, merits enhanced punishment.

Accordingly, amended section §2F1.1(b)(5)(C) recognizes that the conduct of generating or "breeding" identification means warrants substantial additional penalties. The minimum offense level of level 12 accounts for the fact that the defendant in an identity theft case typically has exclusive control over the "bred" means of identification, making it difficult for the individual victim to detect that the victim's identity has been stolen until substantial harms (e.g., a damaged credit rating) have occurred. The minimum offense level also accounts for the non-monetary harms associated with identity theft (e.g., harm to reputation or credit rating), which typically are difficult to quantify. However, for cases in which the nature and scope of the harm to an individual victim is so egregious that the two-level enhancement and minimum offense level provide insufficient punishment, the amendment invites an upward departure.

The WTPA directed the Commission to review "the extent to which the value of the loss caused by the offenses. . . is an adequate measure for establishing penalties. . . ." The amendment provides a minimum loss rule in §2F1.1 that extends to all access devices, not just to cloned wireless telephones. In so doing, similar fraud cases will be treated similarly regardless of the technology or type of access device used in the offense. Additionally, the Commission's research and data supported increasing the minimum loss amount, previously provided only in §2B1.1 (Larceny, Embezzlement, and Other Forms of Theft), from $100 to $500 per access device. However, the data were insufficient to support using this increased amount in cases that involve only the possession, and not the use, of means of telecommunications access that identify a specific telecommunications instrument or account (e.g., ESN/MIN pairs of wireless telephones). (An example of such a case is a defendant who possesses a list of ESN/MIN pairs but has not used any of those pairs to clone wireless telephones.) For such cases, the Commission decided that the minimum loss amount should be $100 per unused means.

**Effective Date: The effective date of this amendment is November 1, 2000.**

597.  **Amendment:** Section 2F1.1(b), as amended by Amendment 595 (see supra), is further amended in subdivision (4) by striking "; or" after "agency" and inserting a semicolon; by inserting "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding; or (C) a" after "(B)"; and by inserting "prior, specific" before "judicial".

The Commentary to §2F1.1 captioned "Application Notes", as amended by Amendment 595 (see supra), is further amended by striking Note 6 in its entirety and inserting the following:

"6.    Subsection (b)(4)(C) provides an enhancement if the defendant commits a fraud in contravention of a prior, official judicial or administrative warning, in the form of an order, injunction, decree, or process, to take or not to take a specified action. A defendant who does not comply with such a prior, official judicial or administrative warning demonstrates aggravated criminal intent and deserves additional punishment. If it is established that an entity the defendant controlled was a party to the prior proceeding that resulted in the official judicial or administrative action, and the defendant had knowledge of that prior decree or order, this enhancement applies even if the defendant was not a specifically named party in that prior case. For example, a defendant whose business previously was enjoined from selling a dangerous product, but who nonetheless engaged in fraudulent conduct to sell the product, is subject to this enhancement. This enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines (e.g., a violation of a condition of release addressed in §2J1.7 (Commission of Offense While on Release) or a violation of probation addressed in §4A1.1 (Criminal History Category)).

If the conduct that forms the basis for an enhancement under (b)(4)(B) or (C) is the only conduct that forms the basis for an adjustment under §3C1.1 (Obstruction of Justice), do not apply an adjustment under §3C1.1.".

The Commentary to §2F1.1 captioned "Background", as amended by Amendment 595 (see supra), is further amended by striking the fourth sentence of the fourth paragraph and inserting the following:

"The commission of a fraud in the course of a bankruptcy proceeding subjects the defendant to an enhanced sentence because that fraudulent conduct undermines the bankruptcy process as well as harms others with an interest in the bankruptcy estate.".

**Reason for Amendment:** The amendment was prompted by the circuit conflict regarding whether the enhancement in §2F1.1 (Fraud and Deceit) for "violation of any judicial or administrative order, injunction, decree, or process" applies to false statements made during bankruptcy proceedings. Compare United States v. Saacks, 131 F.3d 540 (5th Cir. 1997) (bankruptcy fraud implicates the violation of a judicial or administrative order or process within the meaning of the enhancement; United States v. Michalek, 54 F.3d 325 (7th Cir. 1995) (bankruptcy fraud is a "special procedure"; it is a violation of a specific adjudicatory process); United States v. Lloyd, 947 F.2d 339 (8th Cir. 1991) (knowing concealment of assets in bankruptcy fraud violates "judicial process"); United States v. Welch, 103 F.3d 906 (9th Cir. 1996) (same); United States v. Messner, 107 F.3d 1448 (10th Cir. 1997) (same); United States v. Bellew, 35 F.3d 518 (11th Cir. 1994) (knowing concealment of assets during bankruptcy proceedings qualifies as a violation of a "judicial order"), with United States v. Shadduck, 112 F.3d 523 (1st Cir. 1997) (falsely filling out bankruptcy forms does not violate judicial process since the debtor is not accorded a position of trust). See also United States v. Carrozzella, 105 F. 3d 796 (2d Cir. 1997) (district court erred in enhancing the sentence for violation of judicial process in the case of a defendant who filed false accounts in probate court).

The majority of circuits have held that the current enhancement applies to a defendant who

conceals assets in a bankruptcy case because the conduct violates a judicial order or violates judicial process. Commission data indicate that, in fiscal year 1998, 41 defendants received an increase for either "violation of a judicial order . . . or misrepresentation of a charitable organization." The data did not distinguish between the two parts of the enhancement.

This amendment creates a separate and distinct basis for a two-level enhancement under the fraud guideline for a misrepresentation or false statement made in the course of a bankruptcy proceeding. Additionally, the existing enhancement and its accompanying commentary are modified to make clear that, in order for the enhancement to apply in a fraud case not involving a bankruptcy proceeding, there must be a false statement in violation of a specific, prior order. Therefore, any case involving a bankruptcy fraud will result in a two-level enhancement, but in the case of a non-bankruptcy fraud, the enhancement will apply only if a defendant was given prior notice of a particular action. The Commission has decided to treat bankruptcy fraud more severely because of its adverse impact on the bankruptcy judicial process and because of the additional harm and seriousness involved in such conduct. See United States v. Saacks, 131 F.3d 540, 543
(5th Cir. 1997) (noting that bankruptcy fraud is more serious than "the most pedestrian federal fraud offense").

**Effective Date: The effective date of this amendment is November 1, 2000.**

598.    **Amendment:** Section 2K2.4 is amended by striking subsection (a) in its entirety and inserting the following:

> "(a)    If the defendant, whether or not convicted of another crime, was convicted of violating:
>
> > (1)    Section 844(h) of title 18, United States Code, the guideline sentence is the term of imprisonment required by statute.
> >
> > (2)    Section 924(c) or section 929(a) of title 18, United States Code, the guideline sentence is the minimum term of imprisonment required by statute.".

The Commentary to §2K2.4 captioned "Application Notes" is amended by striking Note 1 in its entirety and inserting the following:

> "1.    Section 844(h) of title 18, United State Code, provides a mandatory term of imprisonment of 10 years (or 20 years for the second or subsequent offense). Sections 924(c) and 929(a) of title 18, United States Code, provide mandatory minimum terms of imprisonment (e.g., not less than five years). Subsection (a) reflects this distinction. Accordingly, the guideline sentence for a defendant convicted under 18 U.S.C. § 844(h) is the term required by the statute, and the guideline sentence for a defendant convicted under 18 U.S.C. § 924(c) or § 929(a) is the minimum term required by the relevant statute. Each of 18 U.S.C. §§ 844(h), 924(c), and 929(a) requires a term of imprisonment imposed under this section to run consecutively to any other term of imprisonment.
>
> A sentence above the minimum term required by 18 U.S.C. § 924(c) or

**U.S. v. Andrew Yao Cr. No. 06-27**

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| STUDENT FINANCE CORPORATION, | : | CASE NO. 02-11620 (LK) |
| | : | |
| Debtor | : | |

### DECLARATION OF ANDREW N. YAO
### IN OPPOSITION TO MOTIONS TO APPOINT
### CHAPTER 11 TRUSTEE OF TO CONVERT TO CHAPTER 7

1.    My name is Andrew N. Yao. My office is located in Radnor, Pennsylvania at 5 Radnor Corporate Center, Suite 501, 100 Matsonford Road. I am over 21 years of age, of sound mind, and have never been convicted of a felony. I am the sole shareholder and, until recently, had been the Chairman of the Board of Directors of Student Finance Corporation ("SFC") and Student Marketing Services, LLC ("SMS"). I also own 70%, or controlling interest, of the shares of Student Loan Servicing, LLC ("SLS"). SFC owns the other 30%. I understand that this Declaration is being given in opposition to the Motions to Appoint a Chapter 11 Trustee by Royal Indemnity Company ("Royal") and the United States Trustee.

2.    I received my bachelor's degree in economics, with a major in finance management and political science, from the University of Pennsylvania's Wharton School in 1983. I was engaged in various business ventures between my graduation from college and 1991, when, through CEC Partnership, L.P., I purchased Branford Hall, a small trade school in Connecticut. In 2002, I transferred my ownership interest in CEC and Branford Hall to satisfy a debt for SFC.

GOVERNMENT
EXHIBIT
4
Cr. A. 06-27-GMS

3.    In 1991, I, along with consultants in the industry, began doing market research that led to the formation of SFC. In 1993, SFC was incorporated as a Subchapter "S" corporation under the laws of the Commonwealth of Pennsylvania and began marketing to trade schools. In 1994, SFC originated its first student tuition loan. My interest in financing trade schools developed from my involvement in Branford Hall, the small trade school which CEC purchased in 1991.

4.    When SFC was formed, I was SFC's sole shareholder. I personally capitalized SFC at its inception. In total, I contributed a total of $100,000.00 to capitalize SFC. In or around 1998-1999, Robert L. Bast ("Bast") and the Elizabeth B. Brennan Trust (the "Brennan Trust") also became shareholders of SFC. They remained shareholders for less than a year when their shares were repurchased by SFC. Since SFC repurchased the shares from Bast and the Brennan Trust, I have been the sole shareholder of SFC.

5.    From SFC's inception, and while I served as SFC's president, servicing on SFC's loans was performed by Berwyn Holdings, a Pennsylvania company in which I had no interest. In 1997 or 1998, to take advantage of economies of scale and lower loan servicing costs, SFC began to service its own loans. In conjunction with SFC's beginning to service its own loans, I hired Gary Hawthorne ("Hawthorne") to manage the daily operations of SFC. SFC performed the servicing of the loans it originated and/or purchased until 2000, when SLS was created to handle the servicing of loans purchased or originated by SFC. SLS was formed in consultation with Rusty Saylor, who was a managing director of PNC Capital Markets.

6.    At SFC's inception, the marketing function for SFC was handled by outside companies. I had no ownership interest in those companies. In or around 1996, I hired

2

Perry Turnbull ("Turnbull") to manage school relations and marketing on behalf of SFC. In 2000, SMS was formed to engage in marketing and school relations on behalf of SFC, for a fee.

7.    I have not had involvement in the daily operations of SFC. When I was the sole officer of the company, marketing and servicing were outsourced. Once I hired Turnbull and Hawthorne, they managed the daily operations of SFC. I was the sole director of SFC when Turnbull and Hawthorne were hired. My role in SFC has always been strategic planning, business planning, hiring senior management and providing business relationships to the extent that I could fill such a role. Other than hiring Hawthorne and Turnbull, I have had no involvement in the hiring or terminating of SFC employees. All SFC personnel decisions have been made by Turnbull and Hawthorne since approximately 1998.

8.    When I was the sole director of SFC, there would be one annual meeting. In or about 1999, two additional directors, Hawthorne and Turnbull, were added to the Board of Directors of SFC. When there were three directors, I believe that SFC held quarterly board meetings. In October, 2002, Turnbull resigned from the Board. In April, 2003, David Zulauf joined the Board of Directors of SFC. Recently, all the remaining members of the Board of Directors, including myself, resigned. I have further executed a voting proxy for the voting rights of my shares.

9.    SFC, until 2002, was in the business of purchasing and/or originating student tuition loans, primarily for students enrolled in proprietary trade schools. The majority of students for whom we provided financing attended commercial truck driving schools. After October, 2000, SMS contracted with schools to send loan applications to SFC, which would, if acceptable, provide financing to students. Schools were required to perform certain underwriting evaluations of students, including verifying the students' employability as commercial truck

3

drivers, while SFC evaluated a student's credit history. If a loan was accepted, the school received a discounted amount of the face value of the loan for a student's tuition. The amount of the discount depended, in part, on the credit risk score of the student.

10.    SLS serviced the loans purchased or originated by SFC. SFC funded its loans out of warehouse lines of credit with Wilmington Trust and/or PNC Bank. Once the warehouse lines of credit were nearly exhausted, loans would be packaged and sold to institutional investors through asset-backed securitizations. Royal provided credit risk or enhancement insurance on the securitizations, and also provided similar insurance for loans kept as collateral in the warehouse lines of credit. SLS was required by the securitization transaction documents to report on its collection of the loans in each transaction.

11.    I first learned of the financial distress and extremely high default rates being experienced in SFC's portfolio in February, 2002. At that time, I understand that SFC was negotiating with Royal to have another credit risk or enhancement insurance policy issued. Without the credit risk or enhancement insurance, SFC was unable to complete a securitization transaction. Completing a securitization was necessary because SFC's warehouse line of credit was nearly exhausted, and the proceeds from the securitization were needed to pay down the line of credit and provide SFC with access to sufficient operating capital.

12.    When I learned of the high default rates and the problems with obtaining credit enhancement insurance, I called Royal and discussed the situation with Royal. No one from Royal expressed any surprise about the existence of the forbearance program at SFC. Our conversation was focused on a plan for recovery of potential losses.

13.    In May, 2002, I traveled to Charlotte, North Carolina, with Perry Turnbull, Gary Hawthorne and Dave Zulauf to meet with representatives of Royal. It was our

4

understanding that Royal wanted to discuss our plan to rehabilitate SFC and finalize one final credit enhancement policy. Despite making several promises with regard to the issuance of a credit enhancement policy, Royal did not issue the policy. Instead, without my or SFC's prior knowledge or approval, the meeting was attended by Royal's litigation counsel, who soon afterward filed suit against me and several others in Texas. There was little or no discussion of SFC's recovery plan or the issuance of another credit enhancement policy, which we were told would be the topics of the meeting.

14.     It is my personal conviction that SFC should be reorganized in the Chapter 11 proceeding rather than be liquidated and the assets sold. SFC's breakdown was painful to many parties, including myself. I think that reorganization is the proper and honorable path to the extent that it is feasible and reasonable. Through the reorganization and emergence, I am seeking to correct some of the problems created by the collapse of SFC. Further, I think that SFC has a potential going concern value that can be used for the benefit of the creditors.

15.     All of the equity distributions made by SFC to me were made on a projected cash flow basis. To my knowledge, no distribution to me left SFC without sufficient operating capital. Since SFC is a Subchapter "S" corporation, distributions to me were necessary, in part, so I could pay estimated income taxes. All distributions to me were approved by SFC's Board of Directors and based upon cash flow projections. There were occasionally times when scheduled  distributions to me were either delayed or reduced because there was less cash available than had been projected.

16.     I did not receive any distributions from SFC after mid-February 2002, when I learned of SFC's financial distress. I believe that further distributions to me were scheduled in 2002. However, because SFC was in financial distress, and those distributions

5

would have further hampered SFC's operational ability, I did not take the scheduled distributions. I also quit receiving my salary, which was approximately $250,000.00 per year, and director's fees after SFC's financial troubles began. I have received no money or other compensation from SFC in 2003.

17.    For each equity distribution made to me by SFC, I designated the location to which the distribution should be made. I requested that several distributions to me be sent to other businesses in which I had an ownership interest.

18.    I understand that Royal, in support of its motion, has relied on a transfer made to the Bellagio Hotel and Casino in Las Vegas, Nevada, in February, 2002. I requested that the distribution be made to that location rather than to my personal account for the benefit of my family and, specifically, my grandfather. A very small portion of that distribution may have paid for my own room and board at the hotel, as I have stayed there in the past. That distribution of equity was not in any way related to gambling debt incurred by me, as I do not gamble.

19.    I further understand that Royal has relied, in part, on the proximity of that equity distribution to the Bellagio Hotel and Casino and the layoffs of more than 100 SFC employees. Hawthorne, as President of SFC, was in charge of those layoffs. However, it is my understanding that the cause of those layoffs was SFC's inability to originate and/or purchase new loans after Royal reneged on issuing a final credit enhancement policy.

20.    Since SFC became financially distressed, I have personally paid debts on behalf of SFC and purchased the debts of SFC. I transferred my interest in DHP GP, Inc. to the Bast family in consideration for my personal guarantee of one of SFC's debts. I further transferred my interest in PEG GP, Inc., to the Brennan Trust to purchase SFC debt. My interest in PEG GP, Inc., purchased debt from SFC to the Brennan Trust of approximately $3.5 million.

6

21.    I understand that Royal, in support of its Motion, has relied in part on an exchange of e-mails between me and Dianne Messick, the former controller of SFC, in March, 2000. I recall that someone had proposed a different structure for the second round of financing involving Royal. The structure of securitization transactions did change from time to time, and at this time could have involved new school contracts, although I do not recall all of the specific changes. My goal was always to assure compliance with the myriad of reporting requirements, including, for example, under the Fair Debt Act, for the schools, and for the Trustee for the investors. The reason for my inquiry was to insure that there would be compliance with the various contractual and statutory requirements.

22.    I understand that Royal, in support of its Motion, has also relied in part on an exchange of e-mails between me and Messick in October, 2001, regarding cash flow projections for SFC. As I stated in that exchange of e-mails, my projections were not to be shared with third parties because they contained projections with regard to repurchases, interest rates and interest-only receipts. Messick sought to disclose the cash flow statement to GE Capital, which was a potential competitor of SFC, and I did not want sensitive projections to be disclosed to them or anyone else. By keeping my cash flow projections confidential, I was not seeking to conceal the existence of forbearance payments. To the contrary, I believe that SFC's practice of making forbearance payments out of school reserves was openly disclosed.

23.    I also understand that Royal alleges that "a former officer of SFC" "expressed concerns with forbearance payments" and "characterized the practice as fraud." Based on the details of Royal's allegations others have suggested to me that this individual could be Bob Faix. I do not recall any conversation with Bob Faix, or anyone else, along the lines of Royal's allegation. I did not work directly with Faix, and I believe that Faix was dismissed from

7

his position with SFC because he could not collect the required data and generate reports and support the auditors in generating audited financial statements in a timely fashion. I did express my concerns to Hawthorne about Faix's performance in those areas. However, I only hired Hawthorne and Turnbull, who hired and/or fired everyone else, including Bob Faix.

24.     Royal also appears to rely on conversations that I allegedly had with representatives of SWH Funding in 2002. These representations were made in a lawsuit filed by SWH Funding against SFC and me seeking to recover a number of fees for an $80 million bridge loan that was never funded in 2002. SWH Funding had already provided bridge financing to SFC in the fall of 2001 after the capital markets froze after the events of September 11, 2001. Bridge financing was required to continue purchasing and originating loans from schools after the limit on the warehouse line of credit had been reached and before the asset backed securitization that occurred in November, 2001. I believe that as a result of that prior bridge financing, SWH Funding had access to SFC's policies and procedures manuals and other documents, including copies of "collection screens" (printout of collection agent computer screens) that would show forbearance payments. I do not recall any conversations which are consistent with Royal's allegations concerning SWH Funding. I also deny that I had any conversations with representatives of SWH Funding or Loufbourrow where they expressed dismay over the existence of or process for making forbearance payments.

25.     I had no role in the payment of SFC's expenses or payables. However, I did direct the flow of dividends distributed from SFC, which were approved by the Board of Directors and paid to me or paid to a third party at my direction. I never directed the flow of money within SFC.

8

09/02/03   03:49pm   P. 002

26.    Until June, 2002, when Royal filed a lawsuit naming me as a defendant in Jefferson County, Texas, no one from Royal ever indicated that Royal believed it had been defrauded or otherwise misled by SFC or me.

27.    As described in the First Modified Plan of Reorganization, the Irrevocable Trust of Lore North Yao will contribute at least $200,000.00 in cash to ensure the success of the reorganization and to ensure that the Litigation Trustee appointed under the First Modified Plan of Reorganization will be sufficiently funded.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed by me on this 2nd day of September, 2003, in Delaware County, Pennsylvania.


_____

Andrew N. Yao

9

**U.S. v. Andrew Yao Cr. No. 06-27**

# EXHIBIT C

DEPOSITION
EXHIBIT
YAO #2
IDH 6/27/03

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )
                                          )
STUDENT FINANCE CORPORATION,              )    Chapter 11
                                          )
                                          )    Case No. 02-11620 (LK)
        Debtor.                           )
                                          )

### ROYAL INDEMNITY COMPANY'S AMENDED NOTICE OF 30(b)(6)
### DEPOSITION OF STUDENT FINANCE CORPORATION

Pursuant to Rules 9014(c) and 7030 of the Federal Rules of Bankruptcy

Procedure and Rule 30(b)(6) of the Federal Rules of Civil Procedure, please take notice that

creditor Royal Indemnity Company ("Royal") will take the oral deposition of Debtor Student

Finance Corporation ("SFC") on the subjects listed in Exhibit A attached hereto. The deposition

will take place at the offices of Ashby & Geddes, 222 Delaware Avenue, 17th Floor, P.O. Box

1150 Wilmington, Delaware 19899, at 9:30 a.m. on July 1, 2003. The deposition will be taken

before a notary public or some other officer authorized to administer oaths under the law, will be

recorded by either video tape, audio tape, stenographic means, or a combination of those means,

and will continue from day to day until completed. SFC shall designate persons to testify on its

behalf as to matters known or reasonably available to the organization.



GOVERNMENT
EXHIBIT
6
Cr. A. 06-27-GMS

Respectfully submitted,

ASHBY & GEDDES

Philip Trainer, Jr. (I.D. #2788)
Gregory A. Taylor (I.D. #4008)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888
(302) 654-2067 (Fax)

Michael H. Barr
Kenneth J. Pfaehler
SONNENSCHEIN NATH & ROSENTHAL
1221 Avenue of the Americas
New York, New York 10020-1089
(212) 768-6700
(212) 768-6800
        and
Alan S. Gilbert
SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower
233 S. Wacker Drive
Chicago, Illinois   60606
(312) 876-8000
(312) 876-7934

Attorneys for Defendant Royal Indemnity Company

Dated:  June 24, 2003
128415.1

- 2 -

## EXHIBIT A

### Subjects for Examination

1.   The funding of the Proposed Plan, including the percentage of revenues that will be contributed during the Extended Revenue Sharing Period, the ability of the Yao Entities to contribute to the Foregone Income as set forth in the Plan, and the Funder's ability to contribute $200,000 as set forth in the Plan.

2.   SFC's post-petition financial condition, including its alleged ability to operate profitably in 2002 and 2003, and its ability to operate profitably in the future. This category includes the basis for SFC's assertion in its Disclosure Statement that it "has been able to operate profitably during the post-Relief Date period."

3.   Future revenue and expense projections, cash flow projections, and business forecasts for SFC. This category includes the expected income for SFC during the first six years after the Plan is confirmed and the bases for those expectations, for the projected financial statements that were annexed as Exhibit C to the Disclosure Statement.

4.   The Service and Sell Model, including its reception by schools, the identity of schools that have committed to participating in the Service and Sell Program, and the identity of schools that have declined to participate.

5.   Assets presently owned by SFC, including the interest-only strips, and the value of these assets.

6.   Potential SFC legal actions and/or Avoidance Actions, including any analyses that have been done of the viability of those actions. This category includes any potential actions against truck driving schools, Yao, the Yao Entities, Gary Hawthorne, and Perry Turnbull.

7.   The value of SFC in a Chapter 7 context.

8.   The Proposed Plan of Reorganization, including but not limited to evaluations, financial data, revenue and expense projections, cash flow analyses, and forecasts that were used to prepare it.

9.   The assets, liabilities, income, and other financial information relating to Andrew Yao, Lore Yao, the Lore N. Yao Trust, and any other immediate family members of Andrew Yao.

10.  The underwriting criteria that was used by SFC, the underwriting guidelines that the Schools were supposed to follow when originating student loans for SFC, and the actual underwriting guidelines employed by the schools.

11.  Post-petition efforts made by SFC to borrow money from any institution, entity, or individual.

12.  Efforts made by SFC to resolve amicably its differences with the truck driving schools.

13.  The performance of SFC loans from 1996 to present, including their delinquency and default rates.

14.  Payments of any kind, including loans, salary and distributions of equity, to Andrew Yao, members of Andrew Yao's family, entities owned in whole or in part by Andrew Yao,

Gary Hawthorne, Perry Turnbull, James Pearson, any other SFC officer, director, or owner, Robert Bast, any entity owned in whole or in part by Robert Bast, any member of the Bast Family, the Elizabeth Brennan Trust, the Lore N. Yao Trust, or anyone else at the instruction or direction of Andrew Yao.

15.    Post-petition payments made by Andrew Yao to any members of the Bast Family.

16.    The Lore N. Yao Trust. This category includes the structure of the Trust, its trustee, beneficiaries and owners, and the Trust's ability to make contributions to the Plan.

17.    SFC's static pool reports, including the information contained therein, their recipients, and the individuals responsible for their preparation.

18.    The destruction of SFC documents by its officers, directors, owners, or employees, or at the direction of its officers, directors, owners, or employees.

19.    The circumstances concerning the termination of the employment of Kirk Monteverdi and Robert Faix.

20.    Communications between SFC and SWH Funding, including circumstances relating to the termination of the lending relationship between the two companies.

21.    Communications between SFC and John Loofbourrow & Associates, including the circumstances relating to the termination of the relationship between the two companies.

22.    The Debtor's practice of making "forbearance payments," including when it first began making the payments, the amount of such payments in the years 1997-2003, the source of the payments, how the payments were recorded in SFC's books and records, to whom the payments were made, and to whom the payments were reported.